UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD ANDREW NAGY,

Case No. No. 19-13530

Plaintiff,

District Judge George Caram Steeh

v.

Magistrate Judge R. Steven Whalen

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Todd Andrew Nagy brings this action under 42 U.S.C. §405(g), challenging

a final decision of Defendant Commissioner denying his application for Disability Insurance

Benefits ("DIB")  under Title II  of the Social Security Act.  The parties have filed cross-

motions for summary judgment which have been referred for a Report and Recommendation

pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons set forth below, I recommend that

Defendant's Motion for Summary Judgment [ECF No. 16] be GRANTED and that Plaintiff's

Motion for Summary Judgment [ECF No. 13] be DENIED.

## I.  PROCEDURAL HISTORY

On August 27, 2015, Plaintiff filed an application for DIB, alleging disability as of

July 16, 2013.  ECF No. 9-7, PageID.356 (Tr. 319).  Upon initial denial of the claim, Plaintiff

requested an administrative hearing, held on August 15, 2018 in Flint, Michigan (Tr. 61).

-1-

Administrative Law Judge ("ALJ") Margaret O'Donnell presided.  Plaintiff, represented by

attorney John I. Tsiros, testified (Tr. 66-97), as did Vocational Expert ("VE") Michelle Robb[1]

(Tr. 95-103).  On September 14, 2018, ALJ O'Donnell determined that Plaintiff was not

disabled (Tr. 21-35).

On September 24, 2019, the Appeals Council declined to review the ALJ's decision

(Tr. 1-4).  Plaintiff filed suit in this Court on November 27, 2019.

## II.  BACKGROUND FACTS

Plaintiff, born November 11, 1970, was 48 at the time of the  administrative decision

(Tr. 35, 319).  He received a GED and worked previously as a truck driver and laborer (Tr.

377).  He alleges disability as a result of post-operative left knee problems; right knee, low

back, and right shoulder problems; and depression (Tr. 376).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony before the ALJ:

He lived in a single family home with his wife (Tr. 66).  He drove himself to the

hearing (Tr. 66). Since ceasing work as a truck driver (driver/yard person), he worked

seasonally as a snow plower and a parking lot attendant at a hockey rink (Tr. 67, 69).  He

worked for up to two hours at a time (Tr. 68).  He made a total of $1,478 in 2017 (Tr. 69).

His former work as a driver/yard person for a roofing supply company required him

to maintain commercial property, load trucks, and make deliveries (Tr. 69).  The job required

---

[1]Between transcript pages 95 and 97, both Plaintiff and the VE testified.

him to lift up to 120 pounds (Tr. 70).  After falling and injuring his knee in March, 2013, he underwent two arthroscopic procedures (Tr. 71).  As a result of a 2016 car accident he experienced back problems, "possible" whiplash, and additional knee problems (Tr. 71-72). A 2017 car accident further exacerbated the knee problems (Tr. 72).  He made a  Workers' Compensation claim which was settled in 2016 (Tr. 72).  As a result of the 2016 car accident, he received a settlement from his auto insurance provider (Tr. 75).

He was unable to perform substantial gainful activity since July, 2013 due to bilateral knee problems, complications of a lumbar spinal fusion procedure, headaches, and a herniated cervical spine disc (Tr. 78).  The neck condition, headaches, and ringing ears resulted from his second car accident (Tr. 78).  He used a cane prescribed by a treating source (Tr. 80-81). The lumbar spine fusion had not improved his back pain or lower extremity symptoms (Tr. 81).

Plaintiff was unable to lift more than 10 pounds; sit for more than 20 minutes or stand for more than 10; or walk for more than 50 yards without the help of a cane (Tr. 82). Due to neck pain, he experienced problems looking up and down (Tr. 82). His activities were limited to watching television; reading books or magazines; and occasional fishing (Tr. 83).  His household chores were limited to putting dishes away (Tr. 84).  He was no longer able to hunt but had accompanied others on a hunting trip the previous year where he tended a fire for the hunters (Tr. 83).  He drove 45 minutes to get to the hunting site (Tr. 83-84).

In response to questioning by his attorney, Plaintiff reported that he had been

hospitalized for cellulitis twice in the past year (Tr. 86). His left knee "gave out" on him several times a day (Tr. 87). Ice packs relieved the knee swelling (Tr. 87). His most comfortable position was sitting in a recliner with his feet partially elevated (Tr. 87). He napped for a couple hours every day (Tr. 88). Due to knee and back pain, he experienced interrupted nighttime sleep (Tr. 88). He also experienced left-sided "foot drop" which caused dragging due to numbness (Tr. 88). He used a brace to stabilize the foot (Tr. 89).

In addition to the physical problems, Plaintiff experienced panic attacks characterized by nervousness, sweating, breathing problems, and headaches (Tr. 90). He experienced the attacks most of his life but they had intensified in the past few years (Tr. 90). He coped with the condition with an inhaler and anti-anxiety medication (Tr. 91). Due to physical pain and anxiety, he experienced memory and concentrational problems (Tr. 92). He did not experience side effects from pain medication (Tr. 93). His headaches occurred daily and were characterized by pain, nausea, and blurred vision (Tr. 94). He coped with the headaches by reclining and using cold compresses (Tr. 94).

### B. Medical Records

#### 1. Records Related to Plaintiff's Treatment[2]

March, 2013 occupational health records show that Plaintiff's left knee was splinted after a workplace accident (Tr. 475). Despite complaints of continued knee pain, Plaintiff was

---

[2]

Records pertaining to Plaintiff's condition prior to the alleged onset of disability date of July 16, 2013 are included for background purposes only.

deemed able to return to his regular work duties the following week, (Tr. 474). In May, 2013, he exhibited a normal gait (Tr. 472). Later the same month, he was placed on restricted work duty with no driving and limited climbing and walking (Tr. 469).

A May, 2013 MRI showed a meniscus tear of the left knee (Tr. 478). On July 16, 2013, Edward Lis, Jr., D.O. performed arthroscopic surgery of the left knee (Tr. 482). He deemed Plaintiff unable to work for up to six weeks after surgery (Tr. 554). In December, 2013, John Flood, D.O. noted Plaintiff's report that pain prevented him from "doing anything but light duties" (Tr. 1261). He found that Plaintiff could work with restrictions of sitting for more no more than 60 continuous minutes and standing/walking for 30; no squatting, climbing; and limited twisting and bending (Tr. 1263). The same month, Dr. Lis performed a followup surgery after Plaintiff reported a lack of improvement in the knee condition (Tr. 476). He found that Plaintiff would be unable to work for six weeks after surgery (Tr. 550).

In January, 2014, Plaintiff reported a 50 percent improvement in left knee pain (Tr. 507). Physical therapy notes from the next month state that treatment goals were partially met (Tr. 499). Dr. Lis' March, 2014 records note tenderness of the left knee and quadricep weakness (Tr. 556, 572). Dr. Lis gave a work release date of April 14, 2014 (Tr. 556). The same month, Joseph Armovit, D.O. noted edema of the lower extremities and hypertension with a history of asthma (Tr. 595). Plaintiff's mood and affect were normal (Tr. 596). Dr. Armovit's June, 2014 records note Plaintiff's report that he was "anxious and depressed" due to long-term unemployment (Tr. 589). In September, 2014, Plaintiff was advised to limit junk

-5-

food consumption due to a BMI of 35.74 (Tr. 587). Dr. Armovit noted Plaintiff's report of right-sided hearing loss (Tr. 585).

In April, 2015, Plaintiff reported back pain after an at-home fall (Tr. 576). He showed a decreased range of lumbar spine motion but no tenderness or edema (Tr. 577). He exhibited a normal mood and affect (Tr. 577).

In January, 2016, Plaintiff sought emergency treatment for neck, back, and knee pain after a car accident (Tr. 628-629). Imaging studies of the knees and chest were unremarkable (Tr. 632-640). In April, 2016, Plaintiff rated his left knee pain a "seven" out of "ten" (Tr. 658). He reported that between the March, 2013 injury and undergoing bariatric surgery, his weight ballooned from 320 to 500 pounds (Tr. 659). He exhibited normal insight and judgment (Tr. 660). Imaging studies of the left knee showed moderate arthritis (Tr. 676).

October, 2016 records by Colleen Lineham, M.D. state that Plaintiff was walking independently but reported left lower extremity numbness (Tr. 667). An MRI of the lumbar spine showed severe stenosis at L4-L5 and a bulging disc at L5-S1 (Tr. 679). An MRI of the left knee showed oblique and radial tears (Tr. 680). The following month, Plaintiff reported radiating low back pain, leg weakness, balance problems, headaches, and blurry vision but denied tinnitus (Tr. 689). The following month, he reported asthma-related chest tightness but did not exhibit a cough, shortness of breath, or wheezing (Tr. 854). He was advised to lose weight (Tr. 867-868).

Plaintiff underwent lumbar fusion surgery without complications in January, 2017 (Tr. 698, 701, 706). Followup records from February and March, 2017 show 5/5 muscle strength and a normal gait (Tr. 716-717). Later the same month, he complained of radiating low back pain (Tr. 718). Neurological testing was unremarkable (Tr. 718). In June, 2017, Plaintiff reported ear ringing since the January, 2016 car accident but stated elsewhere that he had experienced "high-pitched ringing in the left ear [for] many years" (Tr. 728, 857). He reported that it was "audible over slight noise" (Tr. 728). A large osteoma of the left ear canal was noted (Tr. 729). Right ear testing ranged between normal and mild hearing loss and the left ear, mild to moderate loss (Tr. 736). An excision of the left ear osteoma was performed in July, 2017 (Tr. 739). August, 2017 CTs of the head and cervical spine taken following a car accident were wholly normal (Tr. 757, 763). A CT of the chest, abdomen, and pelvis and imaging studies of the left knee were also unremarkable (Tr. 760, 762). A physical examination was negative for abnormalities (Tr. 771). September, 2017 records note Plaintiff's report of neck pain and numbness of the left upper extremity (Tr. 844, 854). He denied sleep disturbances (Tr. 845).

In October, 2017, Plaintiff sought emergency treatment for lower extremity redness, swelling, and pain (Tr. 808). He was diagnosed with cellulitis (Tr. 808). Testing for deep vein thrombosis was negative (Tr. 798). An examination of the back was unremarkable (Tr. 805). May, 2018 imaging studies of the left foot showed calcaneal spurs (Tr. 905). Records from the same month show that he was admitted for inpatient treatment for cellulitis (Tr. 906).

Imaging studies of the left knee showed mild narrowing of the medial compartment (Tr. 912, 1156).  Plaintiff reported swelling of the lower left extremity after going hunting a week earlier (Tr. 929).  Veteran Administration records note that Plaintiff was morbidly obese despite a history of bariatric surgery (Tr. 929).  He was prescribed a cane (Tr. 934).  He was deemed able to ambulate independently (Tr. 1159).  He reported irritability, low energy, little motivation, hopelessness, and decreased focus and concentration (Tr. 981, 1112).  He was diagnosed with an "unspecified depressive disorder" (Tr. 981).  The following month, he was prescribed a compression stocking (Tr. 1254).

An August, 2018 MRI of the left knee showed a complex tear of the meniscus (Tr. 1201).  An MRI of the cervical spine showed spondylotic degenerative changes at C5-C6 with moderate narrowing of the left neuroforamen (Tr. 1203).  An MRI of the brain taken in response to Plaintiff's report of dizziness, unsteadiness, and headaches was wholly unremarkable (Tr. 1205).

### 2.  Non-Treating Records

In September, 2014, Asit K. Ray, M.D. performed a consultative examination, noting Plaintiff's report of a March, 2013 workplace injury resulting in a torn knee ligament and meniscus (Tr. 561).  Plaintiff reported two left knee surgeries but no right knee surgery (Tr. 561).  Dr. Ray noted that Plaintiff was not wearing a knee brace (Tr. 561).  He noted that Plaintiff was medically released for work with restrictions but that the employer did not accommodate the restrictions (Tr. 561).  He observed normal posture and that Plaintiff did not

require a cane or walker (Tr. 562). Plaintiff exhibited normal muscle strength (Tr. 562). The

left knee showed mild swelling and slight warmth but no instability (Tr. 563). Dr. Ray found

that Plaintiff was able to perform his usual occupational duties without restriction (Tr. 564).

In January, 2016, Michael Geoghegan, D.O. performed another consultative physical

examination, noting Plaintiff's report that he used a cane "at times" for walking (Tr. 612).

Plaintiff reported that he could walk for 100 yards, stand for 15 minutes, and sit for 30 (Tr.

612). Dr. Geoghegan noted that Plaintiff experienced mild difficulty getting on and off the

exam table and exhibited a moderate left limp (Tr. 513). Due to pain Plaintiff refused range

of motion testing for the lumbar spine (Tr. 613). He exhibited a normal grip strength (Tr.

613). He demonstrated 4/5 strength in the right upper extremity but otherwise full muscle

strength (Tr. 614).

In February, 2016, Matthew P. Dickson, Ph.D. performed a consultative psychological

examination, noting Plaintiff's report of memory problems and panic attacks brought on by

small rooms and loud talking (Tr. 617). Plaintiff reported that he had sustained injuries in a

car accident three weeks earlier including "a pretty good concussion" and the aggravation of

existing neck and back problems (Tr. 617). Plaintiff reported that he took special education

classes while in school for "learning problems" (Tr. 618). He stated that he had been refused

a knee replacement because he was "too young" (Tr. 618). Dr. Dickson noted that Plaintiff's

behavior was socially appropriate (Tr. 618). Plaintiff reported that he was able to cook for

himself, shop, drive, and perform self-care activities (Tr. 618). Dr. Dickson noted a normal

energy level with full orientation  (Tr. 618-619).  He concluded that Plaintiff was capable of

unskilled work with "mild" impairment in responding appropriately to others and adapt to

workplace changes and stress (Tr. 619).  He found that Plaintiff was capable of handling his

benefit funds (Tr. 620).

Later the same month, psychiatrist Ashok Kaul, M.D. performed a non-examining

review of the consultative and treating records, finding moderate deficiencies in

concentration, persistence, or pace due to depression and anxiety (Tr. 163).  He found that

Plaintiff could understand, remember, and carry out simple instructions (Tr. 166).

### C.  Vocational Testimony

Citing job titles found in the *Dictionary of Occupational Titles* ("*DOT*"),  the VE

classified Plaintiff's past work as a material handler/warehouse worker as  semiskilled and

exertionally medium[3] (Tr. 98, 437).   The ALJ determined that the jobs of parking lot

attendant/ticket taker and truck driver did not rise to the level of substantial gainful activity

(Tr. 98-99).

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

ALJ then posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, educational level, and work history:

> [C]an do light work except this individual can stand and/or walk only up to four of eight hours; can occasionally climb, balance, stoop, kneel, crouch, and crawl; can have no exposure to wetness, unprotected heights, dangerous moving machinery, or uneven terrain (Tr. 99).

The VE testified that the above limitations precluded Plaintiff's past relevant work but would allow for the unskilled, exertionally light work of an information clerk (6,800 positions in the national economy); inspector (80,000); and counter attendant (70,000) (Tr. 100). She testified that the need to alternate between sitting and standing every 30 minutes would allow for the *sedentary*, unskilled work of information clerk (60,000); bench assembler (30,000); and hand packer (70,000) (Tr. 100-101). She testified that the need for a cane for walking would not change the sedentary job numbers (Tr. 101). She testified that a limit to occasional overhead reaching would not change either the light or sedentary job numbers (Tr. 101). She stated that her testimony was consistent with the information found in the *DOT,* adding that the testimony as to the sit/stand option was based on her own professional experience (Tr. 101-102).

In response to questioning by Plaintiff's attorney, the VE testified that if the individual were off task 80 percent of the workday, missed more than one day of work each month, or were required to recline for two hours in an eight-hour work shift, all competitive work would be eliminated (Tr. 102).

### D.  The ALJ's Determination

-11-

Citing the medical transcript, ALJ O'Donnell found that Plaintiff experienced the severe impairments of "joint dysfunction/degenerative joint disease, status post left knee arthroscopies with recurrent complex tear; obesity, status post bariatric surgery; and cervical and lumbar spinal stenosis, status post L4-5 fusion," but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 24-25). She found that the condition of tinnitus was non-severe, noting that the medical evidence showed that the condition was "no more than a slight abnormality" (Tr. 24). She also found that the condition of depression was non-severe, finding no more than mild limitation in interacting with others and concentration (Tr. 24-25).

ALJ O'Donnell determined that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following restrictions:

> [He] requires the option to change between sitting and standing every 30 minutes; can occasionally reach overhead; occasionally climb, balance, stoop, kneel, crouch, and crawl; can have no exposure to wetness, unprotected heights, or dangerous moving machinery (Tr. 26).

Citing the VE's testimony (Tr. 100-101), the ALJ determined that Plaintiff was unable to perform any of his past relevant work but could work as an information clerk; bench assembler; and hand packer (Tr. 34).

The ALJ found that Plaintiff's "statements about his symptoms" were "supported by the medical evidence of record" but did not support greater restriction than found in the RFC (Tr. 28). She cited December, 2013 examination records noting the ability to walk up to three blocks, sit for an hour, and stand for 30 minutes (Tr. 28). She noted Dr. Flood's finding

-12-

that Plaintiff would require temporary work restrictions following athroscopic surgery of no more than one hour sitting continuously; no more than 30 minutes continuous standing or walking; and no more than 30 pounds lifting (Tr. 28).  She cited March, 2014 records showing a normal gait without an assistive device (Tr. 28-29).  She noted that one month following a January, 2016 car accident, Plaintiff exhibited a normal gait (Tr. 29).  She cited records created after the August, 2017 car accident showing a decreased range of neck motion but a normal neurological examination (Tr. 30).  She noted that Plaintiff underwent gastric bypass surgery in October, 2014 resulting in a weight loss of 210 pounds from 530 to 320 (Tr. 30).  The ALJ cited hospital records from the relevant period showing that Plaintiff experienced leg swelling while hunting, noting that at the hearing, he denied hunting (Tr. 31).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6ᵗʰ Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6ᵗʰ Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6ᵗʰ Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).  However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In

evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

Plaintiff makes four arguments in favor of remand, arguing first ALJ O'Donnell's non-disability determination was not supported by substantial evidence. *Plaintiff's Brief,* ECF No. 13, PageID.1350. Second, he contends that the ALJ erred by finding that his left knee condition did not meet Listing 1.02A. *Id.* (*citing* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02A. On a related note, he argues third that his spine conditions equal Listing 1.04A. *Id.* at 1351. Finally, he contends that the hypothetical modifiers posed to the VE at the hearing did not fully account for his full degree of impairment, thus invalidating the VE's responding job testimony. *Id.*

### A.  The ALJ's Step Two Findings

In Plaintiff's first argument he contends, in effect, that the ALJ erred by declining to

include the conditions of tinnitus; anxiety and depression; and cellulitis among the "severe" conditions at Step Two of the administrative determination.  ECF No. 13, PageID.1353-1356. This section also includes Plaintiff's arguments that the ALJ erred by declining to accord controlling weight to Dr. Lis' "disability" opinion and by rejecting Plaintiff's professed degree of limitation.

At Step Two, an "impairment or combination of impairments ... [is] found 'not severe' ... when medical evidence establishes only a slight abnormality or [ ] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. February 22, 2008)(*quoting Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998)).  "The goal of the test is to 'screen out totally groundless claims.'" *Id.* (*quoting Farris v. Secretary of Health & Human Services*, 773 F.2d 85, 89 (6th Cir. 1985)).  20 C.F.R. §§ 404.1522(a) and 416.922(a) define a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." *See also* SSR 85-28, supra, at *3 ("Basic work activities" refers to walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" and the capacity for "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and, "[d]ealing with changes in a routine work setting") *Id.*

### 1. Tinnitus

The ALJ found that tinnitus was a non-severe impairment (Tr. 24). She cited June, 2017 records noting diagnosis of tinnitus and osteoma of the left ear and Plaintiff's report that he first experienced ringing of the ears after the January, 2016 car accident (Tr. 24). The ALJ acknowledged that Plaintiff underwent a left tympanoplasty, canaloplasty, and excision of a osteoma in July, 2017 (Tr. 24). In support of her finding that the condition did not create significant work-related limitation, she noted that the "record notes no ongoing significant symptoms or limitations related to [the] condition" (Tr. 24).

Plaintiff has offered conflicting reports as to the onset and duration of the tinnitus. He testified that the condition did not develop until after his second (August, 2017) car accident (Tr. 78). In contrast, treating records state that Plaintiff reported that the condition began in January, 2016 (Tr. 728). At another point he reported "high-pitched ringing in the left ear [for] many years" (Tr. 857).

However, setting aside these inconsistencies, the record supports the ALJ's finding that the condition did not cause significant work-related limitations for 12 months or more. In June, 2017, Plaintiff reported ear ringing, but noted that it was audible over "slight noise" (Tr. 728). Auditory testing done just prior to the July, 2017 surgery showed at most mild hearing loss on the right and mild to moderate on the left (Tr. 736). Plaintiff did not allege that the condition compromised his ability to communicate, *e.g.* hear other people speaking, or noises. The alleged hearing limitations did not interfere with his ability to drive (Tr. 66) or interact with

-17-

others while performing his part-time job as a parking lot attendant (Tr. 67-69). While he cites a government website which notes that approximately 20 million Americans "struggle with burdensome chronic tinnitus" and that two million have "extreme and debilitating cases," none of the evidence shows that Plaintiff's tinnitus caused any significant effect on his work-related activities. While at one point, he reported that he experienced the condition before the purported onset of disability, he declined to list tinnitus among his conditions in the August, 2015 application for benefits (Tr. 376, 857). The ALJ's finding that the condition was chronic but did not cause significant work-related limitation is also supported by the fact that condition was attributed to a bony growth (osteoma) rather than an acute, neurologically-related onset after the 2016 car accident (Tr.729). None of the imaging studies created following the January, 2016 or August, 2017 accidents show a neurological basis for the condition. Because the treating records support the conclusion tinnitus did not create more than minimal work-related limitations, the ALJ did not err in finding the condition non-severe.

### 2. Anxiety and Depression

The ALJ found that the alleged mental impairments were non-severe, citing treating records showing multiple normal mental status examinations (Tr. 24). She noted that Plaintiff's few reports of "depression" and "anxiety" were related to the loss of work and physical restrictions (Tr. 24). She noted that Plaintiff exhibited normal memory and concentration during a consultative examination (Tr. 25). The ALJ cited a May, 2018 diagnosis of depression but noted that Plaintiff declined a psychiatric evaluation (Tr. 25). While Plaintiff

makes reference to his "vertigo," ECF No. 13, PageID.1356, the evidence does not support his claim that he experienced long-term vertigo. Without more, Plaintiff's admitted ability to drive, shop, work part time, and make hunting trips stands at odds that he experienced either severe psychologically based limitations or vertigo (Tr. 67-69, 83-84, 929).

The ALJ's findings are consistent with my review of the record showing that Plaintiff repeated demonstrated a wholly normal mental status on numerous occasions (Tr. 596, 660, 716-717, 845). Contrary to Plaintiff's allegations of panic attacks and memory problems, a consultative examiner observed that Plaintiff was socially appropriate, demonstrated normal memory skills, and a normal mood (Tr. 618-619).

### 3. Cellulitis

The ALJ did not address the condition of cellulitis at Step Two but later observed that Plaintiff developed cellulitis due to a lower leg injury from August, 2017 car accident (Tr. 30). She noted that Plaintiff underwent a brief hospitalization for the condition in October, 2017 (Tr. 30-31). She noted that Plaintiff developed cellulitis again after a May, 2018 hunting trip and was hospitalized for 10 days (Tr. 31).

The omission of cellulitis from the "severe" impairments does not constitute error for multiple reasons. First, Plaintiff cannot show that he experienced the condition for a "continuous period of not less than 12 months" as required by 42 U.S.C. §423(d)(1)(A). Second, while the ALJ acknowledged that "obesity is a known risk factor for cellulitis," the evidence shows Plaintiff's two bouts of cellulitis were brought about by unusual events; first,

abrasions sustained in a car accident (Tr. 808) and second (by Plaintiff's own account) injuries sustained on a hunting trip (Tr. 929). Outside of these periods, the record does not show that he experienced symptoms of cellulitis. He cannot show that working within the RFC for a limited range of sedentary work would result in an exacerbation of symptoms (Tr. 26).

Plaintiff also makes more generalized arguments that the ALJ's determination was not supported by substantial evidence. He faults the ALJ for according "little weight" to Dr. Lis' "disability" findings, arguing that the March, 2014 opinion that he was "currently unable to work at this time" ought to have been given controlling weight. ECF No. 13, PageID.1357 (*citing* Tr. 556). In support of the ALJ's accord of "little weight" to Dr. Lis' "disability opinion," she permissibly noted that it was "unclear as to the time period" for which Plaintiff was "disabled" and that the temporary disability finding referred to Plaintiff's ability to perform his former job at the heavy exertional level rather than the inability to perform any substantial gainful activity (Tr. 31).

Plaintiff's argument that under *Gayheart v. Comm. of Soc. Sec.,* 710 F 3d., 375-376 (6th Cir. 2013), the ALJ failed to provide "good reasons" for discounting Dr. Lis' opinion is without merit. The ALJ correctly noted that Dr. Lis' "opinion" could not be read to suggest that Plaintiff was unable to work continuously for 12 months. The ALJ's accord of "little weight" rests on the fact that (1) the opinion(s) do not indicate that Plaintiff was disabled for a 12-month period, and (2) refer to Plaintiff's inability to perform his former job performed at the heavy exertional level rather than the inability to perform any work (Tr. 31). Dr. Lis' opinion

-20-

that Plaintiff was unable to perform his past relevant work does undermine the ALJ's conclusion that he was capable of a range of sedentary work. Treating records from the same day showing a normal gait, normal reflexes, no dizziness, and a wholly normal mental status tend to support rather than detract from the RFC for a limited range of sedentary work (Tr. 556).

Plaintiff's related argument that the ALJ improperly rejected his professed degree of limitation or failed to provide reasons for doing so is also without merit. The ALJ noted that while Plaintiff complained of continued knee problems following his first surgery, he did not require an assistive device (Tr. 29). She cited September, 2014 records showing no instability of the left knee and Plaintiff's January, 2016 report to the consultative examiner that he could walk up to 100 yards, stand for 15 minutes, and sit for 30 (Tr. 29). As to the back condition, the ALJ noted that Plaintiff's back pain was partially relieved with gastric bypass surgery (Tr. 30). She acknowledged Plaintiff's report of ongoing back pain following January, 2017 fusion surgery but noted that as of June, 2017, he exhibited a normal gait (Tr. 30). The ALJ noted that Plaintiff's activities included personal care tasks, preparing food, hunting, and fishing (Tr. 27). As such, the ALJ's rejection of a portion of the subjective allegations on limitation is entitled to deference. *See Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(An ALJ's assessment of claimant's allegations entitled to "great weight")(*see also Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(ALJ's "credibility determination must stand unless 'patently wrong in view of the cold

record'").[4]

### B.  The Step Three Findings

In his second and third arguments, Plaintiff argues respectively that the ALJ erred by declining to finding him disabled under either Listing 1.02A or Listing 1.04A. *Plaintiff's Brief, ECF No.13, PageID.1360-1366.*

"At the third step of the administrative analysis, a claimant meeting or medically equaling the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Comm. of Soc. Sec.*, 424 Fed. Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (citing 20 C.F.R. § 404.1525(a)).   To establish disability at Step Three of the sequential analysis, the claimant must satisfy all of listing's criteria for a finding that s/he meets a listed impairment. *See*

---

[4]

SSR 16-3p eliminates the use of the term "credibility" from SSA policy. 2016 WL 1119029, at *1. The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." *Id.*; *See* 20 C.F.R. §§ 404.1529, 416.929. However, "the implementation of SSR 16-3p did not abrogate the substantial case law pertaining to credibility evaluations under SSR 96-7p." *Boles v. Comm. of Soc. Sec.*, 2019 WL 5897920, at *7 (M.D. Tenn., Nov. 12, 2019)(*citing Dooley v. Comm. of Soc. Sec.*, 656 F. App'x 113, 119, n.1 (6th Cir. July 28, 2016))("SSR 16-3p removed the term 'credibility' only to 'clarify that subjective symptom evaluation is not an examination of an individual's character'").

*Duncan v. Sec'y of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Houston v.*

*Colvin*, 2017 WL 82976, at *2 (E.D. Mich. January 10, 2017)(Drain, J.)(*same*). The claimant

bears the burden of establishing that he meets or medically equals a listed impairment. *Buress*

*v. Sec'y of Health & Human Servs.,* 835 F.2d 139, 140 (6th Cir. 1987).

### 1. Listing 1.02(A)

Plaintiff argues that his knee condition met Listing 1.02(A), asserting that while the ALJ

"quoted from" the listing itself, she "offered no allusions" to the evidence of record in support

of her conclusion. ECF No. 13, PageID.1362.

The ALJ cited the requirements for meeting Listing 1.02(A), concluding that Plaintiff's

joint conditions did not result in the inability to ambulate effectively as defined by the Listing

(Tr. 26).

The requirement to meet Listing 1.02(A) are listed as follows:

> [G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous
> ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and
> findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A)
> Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.02.

Listing 1.00B2b(1) gives examples of "ineffective ambulation;"

> [E]xtreme limitation of the ability to walk; i.e., an impairment(s) that interferes
> very seriously with the individual's ability to independently initiate, sustain, or
> complete activities. Ineffective ambulation is defined generally as having
> insufficient lower extremity functioning ... to permit independent ambulation

without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.§ 1.00B2b(1).

Listing 1.00B2b(2) gives examples of "effective" ambulation:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Plaintiff's argument fails for a number of reasons. As a threshold matter, none of the records suggests that he experienced an "extreme limitation of the ability to walk." Plaintiff reported that he used a cane but did not allege the long-term use of a walker or any two-handed ambulatory aid. Plaintiff was able to drive to both the administrative hearing and doctors' appointments without assistance. He was able to perform errands. Treating records repeatedly note a normal gait and at the very least, state that he could walk independently. Plaintiff's contention that he was unable to walk for short distances on uneven surfaces stands grossly at odds with his admission that he continued to participate in hunting trips by "tending the fire" for the hunters[5] (Tr. 83). The hunting sites were presumably not located on a sidewalk, lawn,

---

[5]

Plaintiff's response to Defendant's summary judgment motion contains the erroneous statement that RFC contains a preclusion on uneven terrain. ECF No. 18, PageID.1410. In fact, the RFC contains no such preclusion (Tr. 26). While the "uneven terrain" limitation is found in the hypothetical question to the VE, the inclusion of this modifier does not imply that the ALJ ultimately determined that Plaintiff was unable to ambulate effectively (Tr. 99).

or other "even" surfaces.  None of the records suggest that Plaintiff experienced a long-term inability to climb a few steps with the use of handrail.

Plaintiff's implied argument that the ALJ failed to adequately explain her finding that he did not meet Listing 1.02 also fails.  In making the Step Three finding, she noted that the records did not show that Plaintiff was unable to ambulate effectively (Tr. 26).   As noted above, substantial evidence supports this conclusion.  The ALJ's statement that Plaintiff could not meet one of the requirements to meet the Listing is sufficient to support the Step Three finding.  *See Duncan*, *supra,* 801 F.2d at 855.  Elsewhere in her determination, the ALJ cited numerous records created throughout the relevant period showing a normal gait or at a minimum, the ability to ambulate effectively as defined by the Listing 1.00B2b (Tr. 28, 29, 30).  The ALJ's findings are consistent with my own review of the record.

### 2.  Listing 1.04(A)

Plaintiff also disputes the ALJ's finding that he did not meet Listing 1.04(A).  ECF No. 13 , PageID.1365.  In making the Step Three finding that Plaintiff did not meet a listed impairment, the ALJ cited the requirements of Listing 1.04, noting "no evidence of the compromise of a nerve root or the spinal cord with evidence of nerve root compression including motor loss, sensory or reflex loss . . ." (Tr. 26).

For a disability finding under Listing 1.04, the claimant must make a threshold showing

---

In fact,  she explicitly came to the opposite conclusion in the administrative decision (Tr. 26).

of a spinal disorder involving "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[ ], resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.

To meet the "A" criteria for the Listing, a claimant must also show:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Ample evidence supports the ALJ's finding that Plaintiff did not meet all of the requirements of Listing 1.04(A). The ALJ noted that Plaintiff was negative for straight-leg raising on multiple occasions (Tr. 30). Defendant notes that January, 2016, November, 2016, and August, 2017 records also show negative straight-leg raising tests. ECF No. 16, PageID.1396 (*citing* Tr. 613, 689, 718). Substantial evidence showing that Plaintiff did not meet one of the requirements of the Listing, by itself, defeats Plaintiff's Listing 1.04(A) argument. The ALJ also cited multiple records showing normal strength and normal sensation (Tr. 29-30). Substantial evidence showing that Plaintiff did not meet this requirement of Listing 1.04 also defeats this argument. Once again, the ALJ's findings are consistent with my own review of the treating records showing that while Plaintiff at times alleged "weakness," clinical testing showed full motor strength and normal reflexes in all extremities (Tr. 689, 858).

Because the ALJ's Step Three findings were well supported and well explained, remand on this basis is not warranted.

### C.  The Vocational Testimony

Plaintiff's notes that his argument regarding the VE's job testimony (fourth and final argument) is addressed in his first argument that the ALJ's non-disability finding is not supported by substantial evidence.  ECF No. 13, PageID.1350-1351.

It is well settled that vocational testimony given in response to a question that does not include all of a claimant's relevant limitations does not constitute substantial evidence. *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). However, the ALJ is not required to incorporate unsubstantiated claims in hypothetical question to VE or by extension, the ultimate RFC. *Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir. 1994).

 The modifiers posed to the VE for a range of sedentary work, *see* Section II.C., *above*, are restated here:

> [T]his individual can stand and/or walk only up to four of eight hours; can occasionally climb, balance, stoop, kneel, crouch, and crawl; can have no exposure to wetness, unprotected heights, dangerous moving machinery, or uneven terrain (Tr. 99-101).

 The ALJ's determination that Plaintiff did not require more restrictive modifiers is supported by substantial evidence.   For the reasons discussed at length in Section V.A., *above,* the ALJ did not err in declining to reference the non-severe impairments of tinnitus, anxiety, depression, or cellulitis in the hypothetical question to the VE.  The ALJ's finding

that the temporary work excuses issued by a treating source did not support a finding of disability for 12 months or longer is well supported by the treating records.  Likewise, her finding that Plaintiff's allegations of great pain and limitation were contradicted by the ability to perform light chores, drive, fish, hunt, and shop is well supported.

While Plaintiff has launched an exhaustive attack on almost every aspect of the ALJ's determination, the non-disability finding does not contain grounds for remand.  Because the ALJ's decision is comfortably within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

### VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [ECF No. 16] be GRANTED and that Plaintiff's Motion for Summary Judgment [ECF No. 13] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of*

*HHS,* 931 F.2d 390, 401 (6ᵗʰ Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6ᵗʰ Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*


s/R. Steven Whalen
R. Steven Whalen
United States Magistrate Judge

Dated: December 15, 2020


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 15, 2020 electronically and/or by U.S. mail.


s/Carolyn M. Ciesla
Case Manager